## WHALEY et al. v. VIDAL, et al.

Evidence held to warrant a finding that a railroad company was negligent in omitting to sound the whistle or ring the bell before approaching a highway crossing as required by Civ. Code, § 538, and in running its train through a city at a speed in excess of that fixed by an ordinance.

Where reasonable men may draw different conclusions from the undisputed evidence, the question of negligence or contributory negligence is for the jury and it is only when the evidence is without conflict, and is such that all reasonable men must draw the same conclusions, that the question is for the court.

In the absence of evidence to the contrary, the presumption is that a person killed by a train at a railroad crossing exercised due care and the railroad company relying on his contributory negligence has the burden of proving it.

Where the evidence was conflicting as to whether decedent or his companion, traveling at night, knew of a crossing before driving on it, and the court charged that the jury should consider decedent's knowledge of the location of the railroad as disclosed by the evidence, the character of the night, and the weather and the surrounding facts, a finding for plaintiff was a finding that decedent had no knowledge of the crossing and relieved him from the charge of contributory negligence.

A verdict on conflicting evidence is conclusive on appeal.

Where, in an action for the death of a person struck by a train on a crossing, travelers crossing the track immediately before decedent testified that they did not hear any bell or whistle or train, and there was evidence of the blowing of the whistle and ringing of the bell, the question of the giving of the signals was for the jury.

Under Pol. Code, § 1213, providing that the city auditor shall record in a book for that purpose, together with the affidavit of the publisher, all ordinances passed and published, and the book shall be received as evidence without further proof, the ordinance book of a city is properly received in evidence to establish an ordinance appearing in the book.

It is not error to refuse requested instructions substantially covered by the charge given.

The amount of damages resulting to minor children from the negligent death of their father is for the jury, and the court will not set aside the verdict as excessive unless the verdict shows that the jury were influenced by passion or prejudice.

Three minor children, 9, 11, and 13 years old ,respectively, sued for the negligent death of their father, 51 years old, of good habits and health. He was a prosperous farmer and a good business man. He was intellectually brilliant, and a religious man. **Held**, that a

verdict for $11,500 was not so excessive as to show passion or prejudice on the part of the jury.

(Opinion filed June 28, 1911.)

Appeal from Circuit Court, Moody County. Hon JOSEPH W. JONES, Judge.

Action by Cleworth Whaley and others, infants, by Rufus Whaley, their guardian ad litem, against Felix Vidal and others. From a judgment for plaintiffs, defendants appeal. Affirmed.

See, also, 26 S. D. 300, 128 N. W. 331.

*James D. Elliott, George R. Farmer,* and *William G. Porter,* for appellants. *Jordan & Warren* and *A. B. Kittredge,* for respondents.

CORSON, J. This is an appeal by the defendant from a judgment entered in favor of the plaintiffs and from the order denying a new trial. The action was instituted by the plaintiffs as the minor children of Thomas Whaley, deceased, by their guardian, to recover damages claimed to have accrued to them on account of the death of Thomas Whaley on the 6th day of February, 1909, by collision with a locomotive at a highway crossing on appellant's railway at Flandreau in Moody county. The complaint is in the usual form, and alleges that on or about the 6th day of February, 1909, the said Thomas Whaley was traveling with his wife, Mariah Whaley, the mother of these plaintiffs, with due care, in a wagon drawn by two horses, along a public highway and street in the city of Flandreau, which crosses said railway about 1,400 feet east of the depot of said railway company, commonly known as the "Mell Davis Crossing" and while crossing the track on the defendant's railway at said crossing, the said Thomas Whaley and his wife were, by the negligence of the defendant, and its agents and servants, Felix Vidal and Will Larson, who were in charge of said passenger train of said company, struck, run over, and killed while on its way from Airlie, Minn., to said city of Flandreau; such negligence consisted in running said train at a high, negligent, and dangerous rate of speed of about 40 miles per hour, which said high rate of speed had been committed for a distance of over 4,000 feet within the

limits of said city at the time of reaching said crossing by said train, and in omitting to give warning by sounding the whistle or ringing the bell of the locomotive attached to said train, all of which was permitted by said railway company and was in violation of the said ordinance of said city of Flandreau and the laws of the state of South Dakota.

The answer, after admitting the corporation of the company, and that the city of Flandreau was, at the time mentioned in the complaint, a municipal corporation, and that Felix Vidal and Will Larson were at the time of said accident and for a long time prior thereto had been respectively engineer and fireman upon the train which struck and killed the said Thomas Whaley; denies there was any ordinance in force and effect in the city of Flandreau as specified in plaintiff's complaint. And the answer specifically alleges that the injuries of the said Thomas Whaley and his death were caused by and were the result of his own negligence and want of care, and that the want of care on the part of said Whaley was the proximate cause of his injury and death.

The propositions upon which the defendants rely for reversal of the judgment herein are: "(1) That the evidence is insufficient to sustain a finding of negligence on the part of the appellants, or any of them, and that there is no proof of actionable negligence on the part of any of the railway company's employes. (2) That plaintiff's decedent, Thomas Whaley, was guilty of contributory negligence, as a matter of law. (3) That excessive damages were assessed by the jury manifestly appearing to have been given under influence of passion and prejudice. (4) That it is the duty of a person approaching a railway crossing, whether driving or on foot, to look and listen before crossing the track. (5) That the trial court committed reversible error in the following particulars: (a) In rejecting and receiving evidence as specified in the assignment of errors, pages 1 to 19, inclusive; (b) particularly in the court's charge to the jury and in refusing to instruct the jury as requested on behalf of defendants and appellants; (c) particularly in the court's refusal to direct a verdict at the close of all the testimony, as requested in the motion of defendants' and appellants' counsel."

It is disclosed by the undisputed evidence that the defendant's railway passes through the city of Flandreau in an easterly and westerly direction, and that at the point where the accident occurred there was a public highway crossing, running northerly and southerly at the railroad grade; that the street or highway, crossing the track at that point, was known as the "Mell Davis Crossing;" that between 11 and 12 o'clock on the night of the 6th of February, 1909, the said Thomas Whaley and his wife and a nephew and his wife—the latter with a one-horse carriage and the former in a two-horse double seated carriage—left the home of Rufus Whaley in said city of Flandreau, and after passing along certain streets, came into the highway leading to the "Mell Davis Crossing;" that the nephew and his wife were ahead and passed over the crossing and were immediately followed by Thomas Whaley and his wife, who were struck by the engine of the train as they attempted to cross the same, and were both instantly killed. The night was a bright moonlight night, and the engine that struck and killed the said Thomas Whaley and wife, was drawing a passenger train due at Flandreau at about 10.49 p. m. The grade of the railroad from a point some two miles easterly of the crossing descended, and the train run from that point down to the crossing by gravity without the use of steam, and was running at the rate of speed of from 30 to 35 miles an hour.

It is further disclosed by the evidence that at a point 161½ feet northerly of the crossing, there was an unobstructed view of the track to the east and the train could have been seen at a point 1,400 or 1,500 feet easterly of the crossing and at other points between that point and the crossing, the train could have been seen from the highway for a distance of from 700 to 1,400 feet. There was also evidence tending to prove that the highway over which the deceased passed had been cut up by passing vehicles, and, on the night in question, was frozen over, excepting in two or three places near the crossing in which there were still muddy places which made it necessary to travel in a somewhat irregular track along the highway to the crossing.

Felix Vidal, one of the defendants, testified on the part of the plaintiffs substantially as follows: That he was a locomotive

engineer for the defendant company and had been in their employ as such engineer for about 22 years; that on the night of February 6, 1909, he was pulling train No. 23, a passenger train from Jackson, Minn., to Madison; that the train that night was a passenger train consisting of an engine, tender, combination car and smoker, and a day coach; that it was an ordinary engine used in drawing trains; that his run at that time was from Jackson, Minn., to Madison, S. D.; that he was going west; that he remembered the accident happening in the city of Flandreau that night; that it was at the Mell Davis street crossing; that they struck a two-steated surrey crossing on the track; that the surry was right on the street crossing; that he was going about 30 miles an hour when he struck the team. And on behalf of the defendant, he testified in substance as follows: That the train was equipped with modern brakes; that there was a headlight that night burning on the engine; that the coaches and express car were lighted; that in approaching the Mell Davis crossing he gave no special signal; that he gave a long distinct station whistle out perhaps 60 rods, which was blown from 6 to 8 seconds, the usual customary station whistle; no other whistle signals; that the bell was rung by Mr. Larson, the fireman; that he commenced ringing the bell, as near as witness could remember, about the time he began to blow the whistle.

Will Larson, the firman, testifying on behalf of the defendant, stated that before reaching the crossing that night the whistle was blown and the bell was rung; that Mr. Vidal, the engineer, blew the whistle and it was blown, as the witness presumed, about 30 or 35 rods east of the crossing; that it might be more or less; that it was a long, distinct, station whistle and that he began ringing the bell about the time the engineer blew the whistle and continued ringing the same until after the accident.

Lyle Rowe who was a witness on behalf of the plaintiffs, testified in substance as follows: That he lived a mile and a half south of the Mell Davis crossing; that that road is a public highway and section line; that he knew where the Payne corner is and that he knew Mr. and Mrs. Thomas Whaley in their lifetime, and

that they lived 10 miles straight west of Flandreau on a farm; that they were his uncle and aunt; that he saw Mr. and Mrs. Whaley that evening at a tabernacle meeting in the city of Flandreau; that after the services were over, Mrs. Rowe and himself took their buggy from the stable, and that he and Mrs. Rowe went down to Rufus Whaley's house where the deceased, Thomas Whaley, had his team; that their team was hitched up and Thomas Whaley and his wife seated themselves in their surrey; that they both took the front seat, she on the left side; that he, witness, took the lead and his uncle and aunt were behind him; that after passing along several blocks they went to Payne's corner and that the deceased and wife were just behind him; that the distance from the Payne corner to the railroad crossing where the deceased and wife were killed, was about a half· block; that ·from the Payne corner down to the railroad track, the road was rather rough; that it had thawed and had been cut up by the traveling teams going back and forth and that it was frozen over and was rough; that he did not see or hear any train or any noise of it; that he did not hear any bell rung or whistle blown; that at the time the accident occurred he was about 72 or 73 feet south of the track; that when at that point he heard his wife scream, and turned around, looked, and jumped out all about the same time, and that his wife did the same.; that just as he jumped out the team of the deceased passed him—that is the horses; that he ran down to where Mrs. Whaley was and. found her dead; that he then went to the deceased who breathed at the time, but died very shortly after; that the team of the deceased and wife, until they were struck by the train, was just behind them; that it was about half past 11 o'clock at night when the accident occurred; that from the Payne corner down to the railroad track it was rough and they just picked their way along—that is drove slow around the rough places.

We think we have quoted sufficient of the evidence to practically show how the accident happened and as there was no person present at the crossing at the time of the accident, there is no direct evidence as to whether the deceased, Thomas Whaly, and his wife stopped, looked, or listened, before they crossed the track.

At the conclusion of the plaintiff's evidence, and at the conclusion of all the evidence, the defendants moved for a direction of a verdict in favor of the defendants, on the ground, among others, that the defendants were not shown to be guilty of negligence and that Thomas Whaley was guilty of contributory negligence resulting in his death. This motion was denied by the trial court and its ruling duly excepted to.

[1] There was evidence tending to corroborate the engineer and fireman that the whistle was blown and the bell rung before the train reached the crossing, but in view of the fact that neither Lyle Rowe nor his wife heard any bell or whistle, there was at least a conflict in the evidence upon that subject. It will be observed, however, that it is not claimed by either engineer or fireman that any whistle was sounded or bell run at a point 80 rods easterly of the crossing, and that the whistle sounded did not indicate a crossing signal, but a station signal. It will be further observed that it is admitted by the engineer that at the time of approaching the crossing he was running on a down grade at a rate of from 30 to 35 miles an hour.

Section 538, Civ. Code, of this state, requires the engineer to blow the whistle or ring the bell for a distance of 80 rods before crossing a public highway, and section 477 of the Penal Code prescribes a penalty for a violation of the same. The ordinance, introduced in evidence, of the city of Flandreau limits the running of a train through that city at a speed exceeding six miles an hour. The evidence, therefore, was clearly sufficient to warrant the jury in finding that the defendant was guilty of negligence in omitting to sound the whistle or ring the bell at a point 80 rods easterly of the crossing and in running its train through the city of Flandreau at a speed in excess of six miles an hour.

This brings us to the important question, namely, Was the deceased guilty of such contributory negligence as bars the right of recovery of the plaintiffs in this action? It is contended by the appellants that inasmuch as there was an unobstructed view at several points from the Payne corner to the crossing at which the train could have been seen for several hundred feet before it ap-

proached the crossing, and at a point immediately before passing over the crossing, the deceased must have failed to either look or listen, otherwise he would have observed the train in time to have escaped the accident, and that notwithstanding the defendants may have been guilty of negligence, yet if the deceased was guilty of contributory negligence the plaintiffs cannot recover, and the appellant cites a number of decisions in which this view is claimed to have been sustained by appellate courts. It is not contended by the appellants that there is any direct evidence showing that the deceased did not stop, look, and listen, but that the circumstances were such that the inference is irresistible that he did not so stop, look or listen, but we are of the opinion that the court was not authorized to draw such on inference, as a matter of law, from the facts disclosed in this case.

[2] Where reasonable men might draw different conclusions from the undisputed evidence, the question of negligence or contributory negligence is one of fact for the jury, and it is only when the evidence is without material conflict and is such that all reasonable men must draw the same conclusions therefrom that the question is for the court. Grand Trunk Ry. Co. v. Ives, 144 U. S. 408-417, 12 Sup. Ct. 679, 36 L. Ed. 485; Ernst v. Hudson River Ry. Co., 35 N. Y. 9, 90 Am. Dec. 761; Edwards v. C., M. & St. P. Ry. Co., 21 S. D. 504, 110 N. W. 832; Columbia Box & Lumber Co. v. Drown, 156 Fed. 459, 84 C. C. A. 269; O'Connor v. Armour Packing Co., 158 Fed. 241, 15 L. R. A. (N. S.) 812; Schwanenfeldt v. C., B. & Q. Ry. Co., 80 Neb. 790, 115 N. W. 285; Wallenburg v. Ry. Co., 86 Neb. 642, 126 N. W. 289; Gray v. C., R. I. & P. Ry. Co., 143 Iowa, 268, 121 N. W. 1097; Nilson v. C., B. & Q. Ry. Co., 84 Neb. 595, 121 N. W. 1128.

[3] In the absence of evidence to the contrary, the law presumes that the deceased exercised such degree of care and caution as the circumstances and the law require, and the burden of proving that he did not rests upon the defendants throughout the case, and is a question for the jury. Nilson v. C., B. & Q. Ry. Co., 84 Neb. 595, 121 N. W. 1128-1130; Baltimore, etc., Ry. Co., v. Landrigan, 191 U. S. 461-474, 24 Sup. Ct. 137; Northern Pac. Ry.

Co. v. Spike, 121 Fed. 44; Railroad Co. v. Gentry, 163 U. S. 353, 16 Sup. Ct. 1104; Chesapeake & Ohio R. R. Co. v. Steele, 84 Fed. 93-98; Dougherty v. C., M. & St. P. Ry. Co., 20 S. D. 46, 104 N. W. 672; Gray v. C., B. & Q. Ry. Co., 143 Iowa, 268, 121 N. W. 1097.

In the case of Railroad Co. v. Gentry, supra, the Supreme Court of the United States held, as appears by the fourth head-note, as follows: "Where no one personally witnessed the crossing of the track by deceased, nor his death while crossing, the presumption is that he stopped, and looked and listened for approaching trains; and hence it is proper to refuse to charge that there could be no recovery if deceased, by looking and listening, could have known of the approach of the car in time to have kept off the track and prevented the accident." And the court, in its opinion, speaking by Mr. Justice Harlan, says: "One of the assignments of error relates to the refusal of the court to give the following special instructions, asked by the defendant: 'You are instructed that it is the duty of an employe, or any other party, about to cross a railroad track, to look and listen for passing engines, cars, or trains, to ascertain whether or not same are approaching, before going upon the track; and if the party fails to exercise such care, he cannot recover. You are therefore instructed that, if the deceased, L. D. Gentry, by looking or listening, could have known of the approach of the engine and car, and in time to have kept off the track and prevented the injury to himself, and that he failed to do so, you will find for defendant.' It is undoubtedly true, as claimed by the defendant, that the deceased was under a duty not to expose himself recklessly when about to cross the track of the railroad." The court then refers to Railroad Co. v. Houston, 95 U. S. 697, 702, 24 L. Ed. 542, Schofield v. Railway Co., 114 U. S. 615, 618, 5 Sup. Ct. 1125, and Aerkfetz v. Humphreys, 145 U. S. 418, 12 Sup. Ct. 835, and continues: "But the present case did not admit of or require an instruction upon this special subject. There was no evidence upon which to rest such an instruction. As already stated, no one personally witnessed the crossing of the track by the deceased, nor the running of the flat car over him. Whether he did or did not

stop, and look and listen for approaching trains, the jury could not tell from the evidence. The presumption is that he did; and, if the court had given the special instructions asked, it would have been necessary to accompany it with the statement that there was no evidence upon the point, and that the law presumed that the deceased did look and listen for coming trains before crossing the track. In Improvement Co. v. Stead, 95 U. S. 161, 164, the court, speaking by Mr. Justice Bradley, upon the subject of the relative rights and duties of a railroad company and the owner of a vehicle crossing its track, said: 'Those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching.' They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen; and hence it will not be presumed, without evidence, that they do not exercise proper care.' This principle was approved in Railroad Co. v. Griffith, 159 U. S. 603, 609, 16 Sup. Ct. 105. Manifestly, it was not the duty of the court, when there was no evidence as to the deceased having or not having looked and listened for approaching trains before crossing the railroad track, to do more, touching the question of contributory negligence, than it did, namely, instruct the jury, generally, that the railroad company was not liable if the deceased, by his own neglect, contributed to his death, and that they could not find for the plaintiffs unless the death of the deceased was directly caused by unsafe switching appliances used by the defendant, and without fault or negligence on his part."

In Baltimore & Potomac R. R. Co. v. Landrigan, supra, that court again having a similar question under consideration, speaking by Mr. Justice McKenna, says: "There was no error in instructing the jury that in the absence of evidence to the contrary, there was a presumption that the deceased stopped, looked, and listened. The law was so declared in Texas & Pacific Railway Co. v. Gentry, 163 U. S. 353, 366, 16 Sup. Ct. 1104. The case was a natural extension of prior cases. The presumption is founded on a law of nature. We know of no more universal instinct than that of self-preservation, none that so insistently urges to care against injury. It has its motives to exercise in the fear of pain, maiming, and

death. There are few presumptions, based on human feelings or experience, that have surer foundation than that expressed in the instruction objected to. But notwithstanding the incentives to the contrary, men are sometimes inattentive, careless, or reckless of danger. These the law does not excuse nor does it distinguish between the degrees of negligence. This was the ruling in Northern Pacific Railroad Co. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014, the case which plaintiffs in error oppose to Railway Co. v. Gentry. In the Freeman Case a man 35 years old, with no defect of eyesight or hearing, familiar with a railroad crossing and driving gentle horses which were accustomed to the cars, approached the crossing at a trot not faster than a brisk walk, with his head down looking at his horses and drove upon the track, looking 'straight before him without turning his head either way.' This was testified to by witnesses. There was direct evidence, therefore, of inattention. There is no such evidence in this case, and the instructions given must be judged accordingly. The court did not tell the jury that all those who cross railroad tracks, stop, look and listen, or that the deceased did so, but that, in the absence of evidence to the contrary, he was presumed to have done so, and it was left to the jury to say if there was such evidence. The instruction was a recognition of "the common experience of men,' from which it was judged in the Freemen Case that the deceased in that case had not looked or listened, and submitted to the jury that which it was their constitutional duty to decide, and there was enough evidence to justify dispute and from which different conclusions could be drawn."

We have quoted at considerable length from these opinions as they are directly in point in this case and express the unanimous opinion of that learned court. It will be observed in the case at bar that there was no direct evidence as to whether or not the deceased stopped, looked, or listened before passing over the track, and hence, under the rule established by the decisions above cited and quoted from, it was the duty of the jury to draw the inference from the want of evidence on the part of the defendant as to the failure of the deceased to stop, look, and listen, that he did do all required of him under the law. Taking this view of

the case, the defendants failed to establish the defense of contributory negligence as a matter of law, and the court was clearly right in denying defendants' motion for the direction of a verdict in their favor.

We shall not attempt to review the numerous cases cited by the defendants bearing upon the question of contributory negligence, but it must suffice to state that in our view it appears from nearly all of those cases that the party injured or killed by the train while crossing the track was either attempting to cross it in the daytime when there was an unobstructed view of the approaching train for a considerable distance from the crossing, or that there was direct evidence tending to prove that the injured party was guilty of contributory negligence, and that he knew of the existence of the track, and could, beyond any reasonable doubt, have seen the train had he looked and heard it, and heeded it, and thus avoided the injury. It will be observed that the case at bar does not come within either of these classes, and that there is nothing in the evidence to rebut the presumption of due care on the part of the deceased.

[4] There is also, in the case at bar, a conflict in the evidence as to whether or not Thomas Whaley, on the night of the accident, actually knew that there was a railroad crossing existing at that point before he went upon it. It is shown by the testimony that he lived ten miles west of Flandreau; that the village of Colman near his home was his trading point and his place of attending church, and that although he visited Flandreau occasionally, his business did not seem to take him to the vicinity of the Mell Davis crossing very frequently, and it appears from the evidence of Mrs. Rowe, that he had never before visited her home.

While it is true that the witness Mell Davis testified that the deceased had passed over the track some years prior to the accident, he also testified that in the earlier days the traveled path was not, as now, located due north and south upon the section line, but ran, as it were, across lots. The question, therefore, as to whether or not the deceased actually knew of the location of the railroad crossing on the night of the accident, was squarely in

issue before the jury by the charge of the court, to which no exception was taken.

In its charge, the court instructed the jury upon this question as follows: "If, therefore, Thomas Whaley either knew at the time, or by the exercise of ordinary care would have known that he was driving onto the railroad track, if he knew the railroad track was there, yet voluntarily drove on the track, he was negligent in so doing, and the plaintiffs in such case cannot recover. In determining whether or not Thomas Whaley knew, or by the exercise of ordinary care would have known, that the railroad crossing was there, consider his knowledge or want of knowledge of the crossing, his knowledge of the location of the railroad in Flandreau so far as it is disclosed in evidence, the character of the night, the weather, and all the surrounding facts and circumstances so far as disclosed in evidence." And the jury evidently, by their verdict, found that he had no such knowledge.

[5] Having so found upon the conflicting evidence, the verdict is conclusive upon this court and relieves the deceased from the charge of contributory negligence, and it will thus be seen that the presumption of due care on the part of Thomas Whaley, at the time of the accident in question, was not rebutted.

[6] It may be further added that the fact that neither Lyle Rowe nor his wife heard any bell or whistle or railroad train at the time they crossed the track immediately preceding the deceased, clearly raised a conflict in the evidence as to the blowing of the whistle and ringing of the bell requiring that question also to be submitted to the jury.

[7] It is further contended by the appellants that the court erred in admitting in evidence the city ordinance of the city of Flandreau as it appears in the book of ordinances of said city, limiting the speed of trains passing through the city. This contention is clearly untenable.

It is provided, among other things, in section 1213 of the Political Code as follows: "* * * The city auditor shall record in a book kept for that purpose, together with. the affidavit of the publisher, all such ordinances so passed and published; and said

book, or certified copy of the ordinances as so recorded, shall be received as evidence in all courts and places without further proof, or if printed in book or pamphlet form by the authority of the city council, they shall be so received and styled."

Lewis Benson, as a witness on the part of the plaintiffs, testified that he was city auditor of Flandreau; that he had in his possession all such books, records, and files of the office of city auditor as came into his possession as such, and that he had in his possession the book called "Ordinance Book" in which appears what is called ordinance 62, of the city of Flandreau, and which book he produced at the trial. The plaintiffs thereupon offered in evidence pages of the book containing the ordinance referred to and which he produced. We are of the opinion that by the provisions of the section last quoted, that the said ordiance book was properly admissible under the provisions of that section.

[8] It is further contended by the appellants that the court erred in refusing to give the instructions requested by them and refused by the court. These requested instructions are quite lengthy and we do not deem it necessary to set them out in this opinion, as, in our view, the charge of the court clearly and fully covered all the questions presented by the evidence in the case, and that all of the requested instructions correctly stating the law, were covered by the court's charge to the jury and were quite as favorable to the defendants as the law would permit. The charge of the court seems to have been satisfactory as no exception was taken thereto.

[9] It is further contended by the defendants that the verdict of the jury was excessive in the amount awarded to the plaintiffs as damages sustained by them by reason of the death of the deceased for the reason that the same was the result of passion or prejudice. The amount of damages in cases of this nature is peculiarly within the province of the jury, and appellate courts are very reluctant to reverse the verdict of the jury as to amount of damages unless the case is an exceptional one and the appellate court can clearly see that the verdict is for such an amount as does clearly show that the jury were influenced by passion or prej-

udice. As bearing upon this question, see the very learned and elaborate note to the case of Ry. Co. v. Hadley, by Next Friend, 16 Am. & Eng. Ann. Cas. 1, decided by the Supreme Court of Indiana in 1907, and reported in 170 Ind. 204, 82 N. E. 1025, 84 N. E. 13, 16 L. R. A. (N. S.) 527. In that note the general rule is thus stated: "To ascertain what is a fair and just compensation for a personal injury is a judicial problem of difficult if not impossible solution. The law therefore commits this problem to the unbiased judgment of the jury, and when it appears that that judgment has been fairly obtained, and, in view of all the circumstances, has been confirmed by the presiding judge, such judgment must govern unless the damages awarded are so obviously disproportionate to the injury shown to have been sustained as to warrant the belief that the jury must have been influenced by passion, partiality, or prejudice, or have been misled by some mistaken view of the merits of the case. This rule is supported not only by the decisions immediately following, but by practically all the cases hereinafter cited in the note," which gives the amounts awarded in various cases coming before the courts of the country. In the case at bar, the verdict of the jury was for the sum of $11,500.

[10] We are of the opinion that the verdict of the jury, in view of all the circumstances of the case, was not so excessive as to indicate that it was given under the influence of passion or prejudice on the part of the jury. Davis v. Holy Terror Mining Co., 20 S. D. 399, 107 N. W. 374. It will be observed that the action is brought by three sons of the deceased, aged respectively, 13, 11, and 9.

It is disclossed by the evidence that the deceased was about 51 years of age, was a man of good habits, a prosperous farmer, and the expectation of the life of the deceased at the time of his death was about 20 years. It will be observed that the children were of an age at which they required the benefit of a father's instruction physically, intellectually, and morally. It is further disclosed by the evidence that the health of the deceased was good; that he was always rugged and strong; that he had no ailments

other than a slight deafness, and that his habits were perfectly exemplary and good; that he was intellectually brilliant and was a first-class farmer; that everything about his farm was in first-class order; that he was a hard-working man, and was a good business man and good manager, and was a religious man and enthusiastic in church matters. It will thus be seen that the deceased not only might reasonably be expected to have added considerably to his means that he would have to leave to his children had he lived, but that by his care and influence over the children, his life would have been valuable to them. It would seem, therefore, that the verdict of practically $3,800 for each of the minor children could not be regarded as excessive to such an extent as to require the reversal or modification of the judgment.

Numerous errors are assigned as to the admission of evidence on the part of the plaintiffs, but, in our opinion, the court in its ruling upon these questions committed no reversible error, and a discussion of these various errors would prolong this opinion to an unreasonable length.

Finding no error in the record, the judgment of the court below and order denying a new trial are affirmed.